# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**HEATHER COGAR,**

    **Plaintiff,**

**v.**                                                                    **Case No: 5:18-cv-52-Oc-JSM-PRL**

**MIKE PRENDERGAST, as SHERIFF of
CITRUS COUNTY, FLORIDA, JEFF
DAWSY, individually, BRYAN HESSE,
individually, AND MIKE
PRENDERGAST, individually,**

    **Defendants.**

---

## REPORT AND RECOMMENDATION[1]

Upon referral, this employment discrimination dispute is before me on Defendants' Motion for Summary Judgment, to which Plaintiff has responded. (Docs. 62, 71, 82).

As explained below, because Plaintiff has presented sufficient evidence to create an issue of material fact as to whether Defendant Sheriff Prendergast's proffered legitimate, nondiscriminatory reason for her demotion was a pretext for gender discrimination, I submit that Defendant's motion for summary judgment is due to be denied as to Plaintiff's claims under Title VII and the Florida Civil Rights Act. Defendants are, however, entitled to judgment as a matter of law, on Plaintiff's remaining claims for malicious prosecution, false arrest, and civil conspiracy.

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

# I.    BACKGROUND

In January 2017, Plaintiff Heather Cogar was demoted from the position of a road deputy with the Citrus County Sheriff's Office ("Sheriff's Office") to a dispatch position as a civilian communications officer. Plaintiff contends that her demotion was motivated by gender discrimination in violation of Title VII and the Florida Civil Rights Act. Her employment record with the Sheriff's Office and the circumstances giving rise to the demotion are at the center of the disputed issues in this case.

## A.  Plaintiff's Employment History with the Sheriff's Office

In January 2014, Plaintiff, a female, was hired by the Citrus County Sheriff's Office as a deputy sheriff. At the time of her hire, she was 26. (Doc. 1, p. 3). In June 2014, she was highlighted on the Sheriff's Office Facebook Page as one of Citrus County's most influential "40 under 40." (Doc. 1, p. 4). In February 2015, just over a year after her hire, Plaintiff was involved in an incident while off-duty visiting a friend in Citrus Hills, Florida.

As alleged in the original complaint, Plaintiff and her friend "decided to drive around town wearing amusing masks." (Doc. 1, p. 4). Defendants describe the incident as "joyriding." (Doc. 62, p. 3). In any event, after Plaintiff and her friend's vehicle drew the attention of Deputy Sheriff Sanchez, they were pulled over for a traffic violation. (Doc. 1, p. 4). Deputy Sanchez later explained that the vehicle was driving erratically, and he called for backup because "it appeared to be enticing a traffic stop." (Doc. 62-1, p. 11). Deputy Sanchez's concern was heightened due to the possibility of ambushes against law enforcement. Deputy Sanchez was soon joined by three more deputies who together conducted a felony traffic stop. At the instruction of the officers, Plaintiff's friend (who was wearing a mask) exited the vehicle from the driver's side. At that point, Deputy Sanchez recognized the mask because he had seen something like it through mutual friends on Facebook,

and began to suspect that the occupants of the vehicle were Erica Jensen and Heather Cogar. (Doc. 62-1, p. 14). After being instructed to do so, Plaintiff exited the vehicle without wearing a face mask and was recognized by Deputy Sanchez, who told her to leave. Plaintiff contends that the deputies also called her names such as "stupid," "immature," and "jackass," and asked if she had been drinking. (Doc. 63, p. 10).

As a result of the incident, Plaintiff was placed on administrative leave for five weeks while an internal affairs investigation ensued. (Doc. 63, p. 14). Following the investigation, then-Sheriff Jeff Dawsy notified her that she was being terminated for policy violations, including untruthfulness in an official inquiry, conduct unbecoming, and violating laws in the office of the Sheriff. (Doc. 1, p. 5). Sheriff Dawsey stated that his decision to terminate her employment was influenced by what he perceived to be her "cavalier attitude" and her resistance in coming to discuss the investigation with him. Doc. 62-3). Dawsey stated that he determined Plaintiff did not possess the maturity and responsibility necessary to be a sworn officer, and therefore terminated her employment. (Doc. 62-3).

Plaintiff appealed to the Civil Service Review Board, an entity empowered with reviewing disciplinary decisions and making non-binding recommendations to the Sheriff. (Doc. 62-3). The Civil Service Review Board sustained the charge of conduct unbecoming, but recommended that Plaintiff be given lighter discipline (Doc. 62-3). Then-Sheriff Dawsy adopted the recommendation of the Review Board and transferred Plaintiff to a position as a bailiff in the judicial division. (Doc. 62-3). After Plaintiff served in that position for about 15 months, Sheriff Dawsy reinstated her as a road deputy on the recommendation of Under Sheriff Buddy Grant, but against the recommendation of Plaintiff's supervisor in the judicial division, Misty Clendenny. (Doc. 62-3).

Meanwhile, Plaintiff became involved in romantic relationship with another Sheriff's Office deputy, Bryan Hesse. Although they lived together for some time, by December 2016 the couple was in the midst of a turbulent breakup and Plaintiff was gradually moving out of their shared home. (Doc. 74-38). In the early morning hours of December 10, 2016, Plaintiff and Hesse got into an argument at their residence. (Doc. 74-31). According to Hesse, Plaintiff became violent, struck him, and threw things, including candles and his service weapon. (Tr. 74-31). Plaintiff denies striking Hesse or throwing the weapon (Tr. 74-38), but admitted in a recorded conversation with Russ Howard, a domestic violence detective, that she became enraged over learning that Hesse was in an "emotional relationship" with another woman. (Tr. 74-29, p. 14). Plaintiff stated she didn't fully recall due to the "alcohol, mixed with anger" but that she remembered throwing candles and a phone. (Tr. 74-29, p. 14). At some point during their encounter, Hesse began videotaping Plaintiff with a cellphone and then threatened to call 911. When he began to do so, Plaintiff left the residence. Sheriff's Office Deputy Timothy Snedeker responded and took a statement from Hesse, and then turned the investigation over to domestic violence Detective Russ Howard. (Tr. 74-31).

Detective Howard reviewed the evidence, including Hesse's statement and the videotape, and also interviewed Plaintiff. Based on his review, Howard determined that probable cause existed to arrest Plaintiff, which then occurred. (Doc. 62-5, Doc. 63, p. 63-64). Upon learning of the incident, Sheriff Dawsey terminated Plaintiff's employment. (Doc. 62-3).

The subsequent internal affairs investigation into the domestic battery incident was led by Shelley Clark. (Doc. 62-6). Clark conducted several interviews and attempted to interview Plaintiff, but Plaintiff refused to be interviewed. (Doc. 62-6). The investigation found that Plaintiff committed three violations of Sheriff's Office policy, including misuse of weapons for Plaintiff's alleged throwing of a service weapon, conduct unbecoming, and commission of a misdemeanor for

battery of Hesse. (Doc. 62-6). As she had with her prior termination, Plaintiff appealed to the Civil Service Review Board. The Board (which did not have the benefit of Plaintiff's prior discipline record) did not sustain the policy violations. Ultimately, upon consideration of the Board's decision, newly-elected Sheriff Prendergrast sustained the charge of violation of SOP 108.00; Improper Conduct, Conduct Unbecoming, but decided that the charge of violation of SOP 108.00; Use and Handling of Weapons was not sustained. (Doc. 74-25). He also decided to withhold judgment regarding commission of a misdemeanor pending the criminal court disposition. (Doc. 74-25). Ultimately, he reversed the decision to terminate Plaintiff and transferred her to the Emergency Operations Division into a civilian Communications Officer position, effective January 30, 2017. (Doc. 74-25). Plaintiff was also ordered to complete anger management and alcohol abuse courses. (Tr. 74-25).

### B. Comparator Nick Norton's Employment History with the Sheriff's Office

As discussed below, Plaintiff has identified Nick Norton, a white male Sheriff's Office employee as a comparator in this case in an attempt to establish a prima facie case of gender discrimination.

In 2014, Sheriff's Office Deputy Nicholas ("Nick") Norton was alleged to have committed domestic battery. A Sumter County Victim's Advocate notified the Citrus County Sheriff's Office that Norton may have been controlling and physically abusing his girlfriend and his child's mother, Andi Roy. (Doc. 74-8). Roy reported that Norton had committed multiple incidents of domestic physical violence, threats, and controlling behavior, but that Norton had persuaded her to later report that everything was fine. (Doc. 74-8). Sheriff's Office records regarding Roy's accusations include allegations that Norton would forcibly hold her down on the bed and cover her mouth, grab her and drag her into the bedroom against her will, threaten her with custody issues, restrict her

access to a phone, threaten her with Baker Act proceedings, and insult her regarding her history of drug abuse. (Doc. 74-8). Roy stated that Norton would convince her to lie to his supervisor that everything was fine, and that Norton would even be sitting next to her during her conversation with the supervisor and instructing her what to say. (Doc. 74-8). Photos of Roy showed some scratches and bruising (Doc. 74-9).

In September 2014, following an internal investigation into the allegations of domestic battery and misuse of an official law enforcement database (Doc. 74-14), Norton was found to have violated Sheriff's Office policy regarding association with criminals (meaning Roy, who had been convicted of drug offenses) and misuse of the FCIC/NCIC database. Norton was suspended without pay for 80 hours, required to attend counseling, and had his FCIC/NCIC database usage monitored. (Doc. 74-12).

In 2018, Norton was officially disciplined again, this time the Sheriff's stated reason was improper conduct (conduct unbecoming) and ethics violations. (Doc. 74-16). In the early morning hours of March 27, 2018, Citrus County Sheriff's Deputy Chad Yerbury was dispatched to a private home on a report that an unknown shirtless individual was pounding on the windows. (Doc. 74-37). According to Deputy Yerbury's affidavit, he saw that the individual (later identified as Nick Norton) was actively attempting to break into the home and damaging property. The homeowners reported that Norton had demanded entry to the home while identifying himself as a deputy sheriff and throwing his credentials at the door and damaging property. (Doc. 74-37). When he was refused entry, Norton proceeded to the rear of the home, entered a screened porch, and attempted to enter through the rear door. (Doc. 74-37). Deputy Yerbury stated that Norton was visibly "under the influence of alcohol and possibly another substance." (Doc. 74-37). Deputy Yerbury called Lieutenant Lambert to advise him that an off-duty deputy was involved in a suspected attempted

burglary. (Doc. 74-37). At that point, Yerbury believed probable cause existed for Norton's arrest for attempted burglary and misdemeanor criminal mischief, given the circumstances, including the time of night, the victim's statements, Yerbury's own observations, and observed damage to the homeowner's property.

Meanwhile, other deputies arrived at the scene. Norton became uncooperative and physically combative, and pushed and pulled Yerbury and other deputies. Norton eventually began to hit and strike the deputies, and at one point damaged Sheriff's Office radio equipment. When Lieutenant Lambert arrived and inquired about any possible charges, Deputy Yerbury reported that he had probable cause for arrest of Norton on felony charges, including attempted burglary, criminal mischief, battery on a law enforcement officer, resisting arrest with violence, and criminal mischief for damaging Sheriff's Office property. (Doc. 74-37). Deputy Yerbury observed Lieutantant Lambert make a phone call and report that he had called Sheriff Prendergrast and Major Elana Vitt and that they were directing that no arrest be made. Instead, they directed that Norton be committed under the Baker Act and taken to the hospital. (Doc. 74-37). Yerbury stated that, in doing so, Norton was treated differently than a civilian who would have been arrested under such circumstances and, after clearance at a hospital, transported to a Baker Act facility such as The Centers. (Doc. 74-37). Yerbury also stated that, typically, an arrest or warrant for an arrest would follow upon the suspect's release from medical treatment, but that was not done in Norton's case. (Doc. 74-37).

Unsurprisingly, an internal affairs investigation of the incident followed. Internal Affairs Investigator Shelley Clark conducted the investigation swiftly and found that Nick Norton took responsibility for his actions and, therefore, Clark decided that she did not need to interview any additional witnesses. Clark determined that Norton violated Sheriff's Office policy regarding conduct unbecoming an officer and the canon of ethics. (Doc. 74-16). Sheriff Prendergrast

disciplined Norton for those violations with a written reprimand and brief suspension without pay, as well as directing him to complete an alcohol related course and to pay restitution for damages to the victim's property and agency property. (Doc. 74-16).

On January 30, 2018, Plaintiff initiated this action asserting claims for gender discrimination under Title VII and the Florida Civil Rights Act, as well as related claims. (Doc. 1). Plaintiff later filed an amended complaint (Doc. 16), and the individual defendants moved to dismiss certain tort claims. Given the Court's ruling on the motion to dismiss (Doc. 41), only the following claims remain:

- Counts I and II – gender discrimination in violation of Title VII, 42 U.S.C. § 2000e-2 and the Florida Civil Rights Act against Defendant Prendergrast, as Sheriff of Citrus County;

- Count V - False arrest in violation of § 1983 against Defendant Prendergast, as Sheriff of Citrus County;

- Count VI and VII - malicious prosecution under § 1983 against Sheriff Prendergrast and under Florida law against both Sheriff Prendergrast and Bryan Hesse, individually.

- Counts VIII and IX - Civil conspiracy under 42 U.S.C. § 1983 and Florida law against Sheriff Prendergast and Bryan Hesse, individually.

Both Sheriff Prendergast and Bryan Hesse have moved for summary judgment on all claims against them (Doc. 62), and Plaintiff has responded (Doc. 82). The issues are ripe for decision.

## II.   LEGAL STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant carries her burden by showing that there is an absence of evidence supporting

the non-movant's case. *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray,* 461 F.3d 1315, 1320 (11th Cir. 2006). Affidavits submitted in relation to a summary judgment motion must be "based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence." *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1314–15 (11th Cir. 2011).

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents,* 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir. 1996).

## III.    DISCUSSION

### A.    Gender Discrimination Claims

Plaintiff first contends that she was demoted because of her gender and seeks relief under Title VII and the Florida Civil Rights Act. Courts analyze both of these claims under the same framework. *See Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1387 (11th Cir.1998) ("[D]ecisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII."). Plaintiff's claim arises out of Title VII's "disparate treatment" provision, which provides, in relevant part, that it is "unlawful" for an employer to "discharge . . . or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To establish such a claim, a plaintiff must prove "the employer intended to discriminate" against him. *Armstrong v. Flowers Hosp.*, 33 F.3d 1308, 1313 (11th Cir. 1994). Plaintiff may make such a showing through either direct or circumstantial evidence. *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* (citations omitted). Said differently, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.2 (11th Cir. 1998).

Here, however, it is undisputed that Plaintiff does not have direct evidence of intentional discrimination. Thus, Plaintiff must prove her claim through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, Plaintiff must first establish a prima facie case of employment discrimination. *See id.* If Plaintiff establishes a prima facie case, the burden then shifts to the Sheriff's Office to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* If the Sheriff's Office meets this burden of production, the presumption of discrimination raised by Plaintiff's prima facie case is rebutted. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). Finally, Plaintiff must then "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Lewis v. City of Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (citation and internal quotation marks omitted).

### 1.  Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff must show: (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that "similarly situated" employees outside her protected class, known as comparators, received favorable treatment. *See Lewis*, 918 F.3d at 1220. Here, the first three elements are apparently undisputed. Defendants do not dispute that Plaintiff is female and that she was demoted from a job for which she was qualified. Rather, Defendants argue that Plaintiff cannot establish her prima facie case because there are no similarly situated comparators. (Doc. 62, p. 12). Defendants specifically contend that Nicholas Norton, the primary comparator identified by Plaintiff, is not an appropriate comparator as a matter of law. (Doc. 62, p. 13-14).

Recently, in the en banc decision of *Lewis v. City of Union City*, the Eleventh Circuit Court of Appeals acknowledged that its prior decisions attempting to define how similarly situated a plaintiff and her comparator must be had "only sown confusion." 918 F.3d at 1217. The court thus sought to clarify the proper standard for evaluating the sufficiency of a plaintiff's proffered comparator. 918 F.3d at 1218–1229. In doing so, the court rejected prior language (such as that cited by Defendants in this case) requiring a plaintiff to show that her circumstances and those of another employee were "nearly identical." *Id.* Instead, "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators were 'similarly situated in all material respects.'" *Id.* at 1226. As explained by the court, the "materially similar" standard provides plaintiffs the opportunity to establish "an inference of unlawful discrimination" but still allows employers the "necessary breathing space to make appropriate business judgments." *Id.* at 1228.

In announcing this standard, the Eleventh Circuit also identified some "guideposts." *Id*. at 1227-28. The court "envision[ed] the sorts of similarities that will, in the main, underlie a valid comparison." *Id*. Typically, a similarly situated comparator will have: (1) engaged in the same basic conduct (or misconduct) as plaintiff; (2) been subject to the same employment policy, rule or guideline as plaintiff; (3) "ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) share plaintiff's employment or disciplinary history. *Id*. The court reasoned that "a valid comparison will not turn on formal labels, but rather on substantive likenesses." *Id*. "[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id*. at 1227 (internal citations and quotation marks omitted).

This case is somewhat unique among cases involving comparators in that Plaintiff proffers a considerable amount of detailed information regarding her alleged comparator, Nicholas Norton, his alleged misconduct, and his employment and disciplinary history, as outlined above. To summarize, in 2014, Norton was accused of and investigated for domestic battery based on reports from his live-in girlfriend. The allegations included verbal abuse and physical violence. (Doc. 74-7 & 74-10). Following an internal affairs investigation, Norton was found to have committed violations of Sheriff's Office policy involving association with a criminal and misuse of an official database, but not domestic battery even though that was the initial allegation and the nature of the conduct reported by his then-girlfriend to both a Victim Advocate and an investigating officer. In terms of discipline, Norton was suspended without pay for 80 hours, required to attend counseling, and had his FCIC/NCIC usage monitored. (Doc. 74-12).

In 2018, Norton was again disciplined for misconduct after attempting to enter a private residence while extremely intoxicated. (Doc. 62-2). Evidence proffered by Plaintiff regarding this

incident demonstrates Norton was also belligerent and violent toward responding Sheriff's Office deputies, and that he damaged Sheriff's Office property. Although the responding deputy stated that probable cause existed for Norton's arrest on numerous counts (including felony charges), Lt. Lambert and Sheriff Prendergrast interceded and directed that Norton be taken to a hospital under the Baker Act, rather than arrested. Even after the incident, Norton was not arrested or charged and received only a 40-hour suspension for conduct unbecoming and an ethical violation, following which he returned to duty as a School Resource Officer. (Doc. 62-2). In addition, the internal affairs investigation was brief and only entailed Norton himself being interviewed by investigator Shelley Clark. (Doc. 62-6).

Following the "guideposts" of *Lewis*, the Court first observes that it is not necessary for Plaintiff and Norton to be identical, or even nearly-identical. 918 F.3d at 1227. A close reading of Defendants' motion for summary judgment reveals that Defendants do not dispute two of the similarities that the Eleventh Circuit defined as underlying a valid comparison: (1) that Plaintiff and Norton were under the jurisdiction of the same supervisor; and (2) that Plaintiff and Norton were subject to the same employment policy. (Doc. 62, p. 13-14). Both Plaintiff and Norton worked and were disciplined under Sheriff Dawsy initially, and then under newly-elected Sheriff Prendergast. There is apparently no dispute that they were both subject to the same employment policies; indeed they were both disciplined under the same Code of Conduct. (Doc. 74-16, 74-34).

Defendants do argue that Norton committed different offenses than Plaintiff, held a different position than Plaintiff, had different employment history, and different disciplinary history. (Doc. 62, p. 14). Defendants maintain that the two held different positions, with Norton being a school resource officer and Plaintiff being a road deputy. Beyond those labels, however, Defendants do not make any attempt to explain how the positions are different for the purposes of this analysis. It

is not necessary that Plaintiff and her comparator to have precisely the same title. *See Lathem v. Dept. of Children and Youth Servs*., 172 F.3d 786, 793 (11th Cir. 1999). And, as Plaintiff points out, both positions are sworn law enforcement officers. Sheriff Prendergast testified, "A deputy's a deputy. . . Either you're a deputy or you're not." (Doc. 77, p. 208).

The two remaining guideposts are worthy of the most discussion here. First, did Plaintiff and Norton engage in the same basic misconduct? Over approximately a three and a half-year span, Norton was accused of domestic battery, misuse of a law enforcement database, as well as drunk, belligerent, and disorderly conduct, including attempting to enter a private residence and damaging property. Over approximately a two-year span, Plaintiff was accused of conduct unbecoming an officer and misconduct associated with the 2015 traffic stop incident while joyriding with a friend, as well as domestic battery, misuse of a weapon and conduct unbecoming an officer associated with the December 2016 incident with her former boyfriend Bryan Hesse.

Both Plaintiff and Norton were involved in alleged physical altercations in their home with their live-in romantic partners. Under the circumstances here, the Court has no trouble concluding that the alleged incidents of domestic battery amount to the same "basic conduct" as described in *Lewis*. 918 F.3d at 1227. *Contra Mitchell v. Toledo Hosp*., 964 F2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for misuse of employer's property could not rely on comparative conduct of absenteeism and insubordination). The Court also concludes that the two other incidents, Plaintiff's joyride and Norton's intoxicated attempted break-in, are similar enough to form a valid comparison. Both incidents involved off-duty shenanigans that ultimately resulted in charges of misconduct and internal investigations. In Norton's case, he admitted to drinking too much with friends prior to the incident. In Plaintiff's case, she was joyriding with a friend and was asked by deputies during the vehicle stop if she had been drinking. Both incidents involved allegations of

poor judgment. In both cases, the primary disciplinary charge was conduct unbecoming. (Docs. 74-16 & 62-3).

Next, it is true that Plaintiff and Norton had different employment and disciplinary histories – at least in terms of how their conduct was officially handled by the Sheriff. As a result of Norton's misconduct, he was only suspended and never terminated or demoted. As a result of Plaintiff's misconduct, she was terminated twice, but after appealing to the Review Board was able to keep her job through a transfer and demotion. While their official discipline records may be different, both Plaintiff and Norton have similar histories in that they were both the subject of two different internal investigations over a similar time period, for similar misconduct. And, it is worth noting that Plaintiff's theory of disparate treatment discrimination could explain the differences in their discipline records.

As Plaintiff argues at length, Norton's misconduct was similar or arguably more serious than hers, yet she was initially terminated on each occasion while he was only suspended. Further, Norton was alleged to have committed domestic battery, but the Sheriff only found him to have committed policy violations involving association with criminals and misuse of a database. And while the court is in no way prejudging factual issues or issues of credibility, the victim statements that Norton's girlfriend Andi Roy gave to investigators are at least plausible to support the allegations of numerous incidents of domestic battery. (Doc. 74-8). Plaintiff was also alleged to have committed domestic battery (albeit on only one occasion), and was found by the Sheriff to have committed unlawful conduct and commission of a misdemeanor, as well as improper conduct and conduct unbecoming. The record before the court contains evidence from which a jury could infer discriminatory intent based on the perplexing differences between how Norton and Plaintiff's allegations of domestic battery were handled.

If the statements of Andi Roy and Plaintiff are credited, there is an issue of fact regarding whether Norton was treated more favorably than Plaintiff in very similar circumstances. Indeed, the record creates an issue of fact regarding whether Norton was treated more favorably, despite engaging in very similar but arguably more egregious and ongoing domestic violence. Likewise, when Norton engaged in serious misconduct involving an attempted break-in, he received relatively light discipline in the form of a suspension and (due to the Sheriff's intervention) was not arrested or criminally charged. When Plaintiff engaged in misconduct in the form of her joyriding incident, she was promptly terminated. And while Defendant makes much of the fact that Plaintiff had been terminated twice while Norton had only been suspended, that argument glosses over the overall circumstances and the details of the underlying misconduct.

Viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that she and Norton are similarly situated in all material respects, and that Norton (a male) was treated more favorably. Both were sworn deputies under the jurisdiction of the same Sheriffs, subject to the same employment policies, and engaged in the same basic types of misconduct. Given these similarities and the evidence proffered by Plaintiff regarding the overall circumstances, the Court also finds that Plaintiff and Norton shared sufficiently similar employment and disciplinary history to the extent relevant for this analysis.

To inform this decision, the Court has surveyed recent cases in the circuit citing *Lewis*. Where plaintiff brought a claim arising from having to work undesirable shifts, co-workers were found to be similarly situated in all material respects because they all had the same rank and position and were all under the jurisdiction of the same supervisor who decided schedules. *See Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1239 (N.D. Ala. 2019). Another court held that, although a plaintiff and his comparator did not share the same employment history, he identified a valid

comparator where both were crane operators subject to the same policies and engaged in sufficiently similar misconduct involving crane operation and safety guidelines. *See Detrick Lewis, v. United States Steel Corp.*, No. 2:18-CV-00428-RDP, 2019 WL 6829993, at *10 (N.D. Ala. Dec. 13, 2019)

On the other hand, a plaintiff who was terminated for sleeping while on duty at his workstation and identified only employees who slept on their breaks failed to identify a proper comparator because sleeping during breaks was permitted. *See Lovett v. Georgia-Pac. Consumer Prod., LP*, No. 4:17-CV-64, 2019 WL 4894901, at *6 (S.D. Ga. Oct. 3, 2019). Where a plaintiff with supervisory duties was terminated for allowing a dehydrated employee to return to work and otherwise failing to follow the instructions of the medical office, another employee who had only limited involvement in the incidents was not a valid comparator. *See Jackson v. Blue Bird Corp.*, No. 18-14155, 2019 WL 6048916, at *5 (11th Cir. Nov. 15, 2019). Where a plaintiff was terminated for chronic tardiness, another employee who worked a different shift, had a different immediate supervisor, and was late much less frequently than Plaintiff was not a valid comparator. *See Hartwell v. Spencer*, No. 18-14488, 2019 WL 5957362, at *6 (11th Cir. Nov. 13, 2019). A plaintiff who did not receive step raises failed to identify a valid comparator where he only identified employees who (unlike the plaintiff) held the certification that the step raises were conditioned upon. *See McQueen v. Alabama Dep't of Transportation*, 769 F. App'x 816, 822 (11th Cir. 2019). A plaintiff failed to identify a valid comparator where comparator was subject to different employment policies, and plaintiff was on medical work restrictions, while the comparator's medical condition was unknown. *See Vaughn v. Sizemore, Inc.*, No. 5:17-CV-1528-LCB, 2019 WL 5963615, at *14 (N.D. Ala. Nov. 13, 2019). A plaintiff, who failed to identify anyone who engaged in the same type of misconduct or held a similar position within the company, failed to demonstrate a similarly situated comparator. *See Menefee v. Sanders Lead Co., Inc.*, No. 19-10433, 2019 WL

4466857, at *4 (11th Cir. Sept. 18, 2019). And, this court has held that a windshield installer's failure to use a bonding agent critical for customer safety was not the same basic conduct as comparators' use of a knife tool that was disfavored by the employer. *See Frazier v. Safelite Grp., Inc.*, No. 3:17-CV-1366-J-32MCR, 2019 WL 2372257, at *4 (M.D. Fla. June 5, 2019).

The undersigned has also carefully considered this Court's recent decision in *Winthrop v. Chris Nocco, as Sheriff of Pasco Co. Fla.*, 8:18-cv-01452-JSM-AEP (Aug.8, 2019, Moody, J.), an unpublished decision relied upon by Defendants. In *Winthrop*, the plaintiff was terminated from her position as a Pasco County Sheriff's deputy after she was arrested by the New Port Richey Police Department and charged with domestic battery of her wife. The Court granted summary judgment on plaintiff's employment discrimination claims in favor of the defendant because the plaintiff failed to present evidence regarding comparators creating a genuine issue for the finder of fact. It was undisputed that the plaintiff was investigated and arrested by an agency independent from her employer. It was also undisputed that every employee of the defendant who had been arrested for domestic violence was immediately terminated. The only comparators identified by Plaintiff were not arrested for domestic violence, or (in the case of one purported comparator) had been arrested for domestic violence eight years previously under a different Sheriff as the decisionmaker.

*Winthrop* is helpful here because it demonstrates that merely being arrested for misdemeanors would be too broad a classification. The Court found that to be an appropriate comparator, other employees would have had to commit the same offense of domestic violence. That said, the holding in *Winthrop* is distinguishable from the instant case. In *Winthrop*, the plaintiff's alleged comparators had been charged with offenses such as driving under the influence and resisting arrest, and the arrests had occurred more than five years prior to Plaintiff's arrest. *See* No. 8:18-cv-01452-JSM-AEP, Doc. 33, p. 3-4. The *Winthrop* plaintiff was arrested by an

independent agency, following that agency's independent investigation. Finally, while the result would have been the same under either standard, the *Winthrop* case refers to the "nearly identical" standard instead of the "similarly situated in all material respects" standard articulated in *Lewis.*

In *Lewis,* the Eleventh Circuit expressly acknowledged that the "all material respects" standard "serves the interest of sound judicial administration by allowing for summary judgment in *appropriate* cases – namely, where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Lewis*, 918 F.3d at 1228. Even with the guideposts provided by *Lewis*, whether a plaintiff has identified a valid comparator remains a fact-driven, case-by-case decision. Here, viewing the evidence in the light most favorable to Plaintiff, the Court cannot say that Plaintiff and Norton (and their respective histories of alleged misconduct) are so dissimilar to permit such an inference. To the contrary, essentially all of the types of similarities that underlie a valid comparison are met, and those similarities do permit a valid inference regarding discrimination. I submit that Plaintiff has proffered evidence sufficient to establish that Norton is an appropriate comparator.

### 2.     Defendant's Non-Discriminatory Reasons for Demoting Plaintiff

Because Plaintiff has established a prima facie case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citing Burdine, 450 U.S. at 253). The burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.*

Here, the Sheriff's Office has easily discharged its burden, as it says it demoted Plaintiff because of her misconduct and prior disciplinary history. (Doc. 62, p. 1). Further, it is not appropriate for the Court to question the Defendant's reasoning. *See Flowers v. Troup Cty, Ga.,*

*Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. We are not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" (*quoting Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).

### 3.  Plaintiff's Pretext Arguments

Because Defendant has met its burden of production, the burden shifts back to Plaintiff to show that Defendant's proffered reason is pretext for unlawful discrimination. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). Where the defendant offers the plaintiff's violation of a work rule as its reason for discharging the plaintiff, "the reason 'is arguably pretextual when a plaintiff submits evidence (1) that [he] did not violate the cited work rule, or (2) that if [he] did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.'" *Landry v. Lincare, Inc.*, 579 F. App'x 734, 738 (11th Cir. 2014) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).

After careful review, the Court concludes there is a genuine issue of material fact regarding why the Sheriff terminated, then upon reconsideration, demoted Plaintiff and not Norton for committing the same or similar misconduct. Beyond that, Plaintiff also points to what she describes as the Sheriff's shifting reasons for her discipline. For example, while Sheriff Prendergast stated he was "incredibly concerned about the sustained allegations of misuse of a weapon," ultimately in his decision of the Sheriff, he did not sustain this alleged policy violation. (Doc. 74-25). It is also notable that Sheriff Prendergast states he was "incredibly concerned" and "alarmed" about Plaintiff's misconduct, but by comparison did not express any such concern about Norton's behavior. Rather, Prendergast stated Norton was not charged with a crime because it was the

homeowners' desire not to bring charges. (Doc 62-2). Sheriff Prendergast further explains that Norton's 2018 misconduct did not involve his arrest and instead involved his being taken to a hospital. As described above, this explanation amounts to circular reasoning and fails to account for the undisputed statements of Deputy Yerbury that the Sheriff himself intervened instructing that Norton not be arrested. It is further perplexing that Sheriff Prendergast cited his concern and alarm about Plaintiff's "poor behavior" but is silent about Norton's behavior (which is arguably equally or more alarming), despite Norton holding a position as a school resource officer. That the Sheriff himself was involved in the decision not to arrest Norton and to give him special treatment is additional evidence of pretext.

#### 4.   Additional Circumstantial Evidence of Discrimination

The familiar *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff's claim can also survive summary judgment if she presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Thus, regardless of whether Norton is an appropriate comparator, the Court must consider all of the circumstantial evidence presented in this case to see if a reasonable inference of discrimination has been raised.

To that end, and in addition to the above evidence, Plaintiff also points to irregularities in the internal investigations, such as conflicting evidence regarding whether there was any basis to support Hesse's claim that she battered him. Plaintiff identifies Detective Howard's conflicting statements and an admission by investigator Clark that her investigation was not fair to Plaintiff. Plaintiff also points to the Sheriff's hypocrisy for intervening and directing Norton not be arrested, as well as giving Norton "half the punishment he received for his second violation of the same

policy even though Norton has an aggravating circumstance on his file." (Doc. 82, p. 19). Plaintiff further cites to the suspicious timing of events, including inflammatory text messages she received from Hesse just three days before the alleged battery (such as "Fuck You!!! Fuckkkk you heather!! Go get pregnant again or fired or whatever dumb shit you want to do…. I hate you and never want to see you again." (Doc. 74-33). She also offers a report reflecting that Hesse objected to Plaintiff's re-hire and would have preferred that she remain terminated. (Doc. 74-35). Finally, Cogar stated that high ranking Sheriff's Office employees such as Captain Smith and Commander Buddy Grant made a variety of comments about her sexual relationships with deputies as a means for career advancement, as well as comments about her age and appearance being assets to her career. (Doc. 74-38).

While the Court concludes that Norton is a proper comparator, thus allowing Plaintiff's claim to proceed under *McDonnell Douglas*, I submit in the alternative that there is sufficient evidence to raise an inference of discrimination under a mosaic theory. As the Eleventh Circuit has explained, "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328. Rather, a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.

I submit that here, viewed in the light most favorable to Plaintiff, there is sufficient evidence that Plaintiff's gender was considered in her demotion. That is, a jury could find "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id*. (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th

Cir. 2011). For these reasons, Defendants' motion for summary judgment is due to be denied as to Plaintiff's gender discrimination claims.

### B.      Plaintiff's Claims for Malicious Prosecution and False Arrest

In addition to her claims for gender discrimination, Plaintiff also brings claims for false arrest under § 1983 (against Sheriff Prendergast in his official capacity as Sheriff of Citrus County), for malicious prosecution under § 1983 and Florida law (against Sheriff Prendergast in his official capacity and Bryan Hesse, individually), and for civil conspiracy under § 1983 and Florida law (against both Sheriff Prendergast in his official capacity and Bryan Hesse, individually).

To begin, based on her response to Defendants' summary judgment motion (Doc. 82, p. 20), Plaintiff appears to have abandoned the majority of these claims. She does not address the claims against Sheriff Prendergast in his official capacity at all, and she also does not address the claims for civil conspiracy at all. In two brief paragraphs at the end of her memorandum, however, she does argue that Hesse engaged in malicious prosecution creating false arrest and contends that his inflammatory text messages create an issue of fact. In support of her argument, Plaintiff relies upon text messages that she contends demonstrate malicious intent to get her fired, and his complaint that her working at the Sheriff's Office created a hostile work environment for him (Doc. 74-35). Plaintiff also contends that there was not sufficient evidence to support probable cause for her arrest because Detective Howard conceded there was no strike depicted on the video taken by Hesse on his cellphone. Plaintiff thus argues that, because there is no contact and no battery in the video, then there is no specific or articulatable fact supporting probable cause for battery.

The parties do not dispute that the absence of probable is a necessary element of Plaintiff's malicious prosecution and false arrest claims. Indeed, under § 1983 and Florida common law, a Plaintiff has the affirmative burden of demonstrating an absence of probable cause in order for her

claims to proceed. To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir.2003). And, under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. *Durkin v. Davis*, 814 So.2d 1246, 1248 (Fla.Dist.Ct.App.2002) (citing *Burns v. GCC Beverages, Inc*., 502 So.2d 1217 (Fla.1986)).

Defendants contend that there was probable cause for Plaintiff's arrest. The Court agrees that, even when the facts are viewed in the light most favorable to Plaintiff, there is no disputed issue suggesting an absence of probable cause for Plaintiff's arrest. Notably, domestic violence Detective Howard stated that, based upon Hesse's sworn statement averring to the battery, the video (which did not show a strike but generally corroborated Hesse's statement), Plaintiff's own statement (which also generally corroborated Hesse's statement) and admission to drinking and losing her temper, he determined that probable cause existed for Plaintiff's arrest and she was arrested. (Doc. 62-5). Howard further stated that he was not asked by Hesse to arrest Plaintiff, and he did not discuss the matter with the Sheriff. (Doc. 62-5). These facts are sufficient to support Howard's determination of probable cause, and Howard did not "have a duty to investigate and decide the potential viability of a defense" before seeking an arrest warrant. *See Pickens v. Hallowell*, 59 F3d 1203, 1207 (11th Cir. 1995).

Further, although Plaintiff contests the existence of probable cause based on conflicting evidence, her argument is not persuasive. Plaintiff contends that her own denial of hitting Hesse, the absence of a strike in the video, and Hesse's text messages reflecting malicious intent demonstrate the absence of probable cause. The existence of conflicting evidence, however, does not undermine a finding of probable cause. "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019).

Based on the record before the Court, I submit that no reasonable factfinder could find an absence of probable cause for the arrest of Plaintiff in this case. The existence of probable cause is a bar for Plaintiff's claims for false arrest and malicious prosecution, both under Florida common law and § 1983.

On a final note, as mentioned above, Plaintiff has failed to respond in any way to Defendants' arguments in favor of summary judgment on her claims for civil conspiracy under § 1983 and Florida law, as well as her remaining claims against Sheriff Prendergast. As such, Plaintiff is deemed to have abandoned those claims. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (stating "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## IV.    RECOMMENDATION

For the reasons discussed above, I respectfully recommend that Defendants' motion for summary judgment (Doc. 82) be denied as to Plaintiff's claims for gender discrimination against the Sheriff's Office under Title VII and the Florida Civil Rights Act. In all other respects, I recommend that Defendants' motion for summary judgment be granted.

Recommended in Ocala, Florida on December 20, 2019.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy